UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 2:12-cr-00112-2 |
| | : | |
| NATALYA SHVETS, | : | |
| Defendant | : | |

**O P I N I O N**
**Shvets' Motion for Accounting and Satisfaction of Judgment, ECF No. 473 - Denied**

**Joseph F. Leeson, Jr.**
**United States District Judge**

**October 19, 2026**

## I. INTRODUCTION

Defendant Natalya Shvets was sentenced more than two decades ago and has paid less than $7,600 toward her restitution obligation of $253,196, but wants her judgment to be declared satisfied based on the reallocation of payment by a co-defendant. Shvets's last restitution payment was seven years ago, but in that same time she has filed more than twenty-five motions, letters, and briefs, has been heard at three evidentiary hearings, and has filed and litigated an appeal with the Third Circuit Court of Appeals. For the reasons set forth below, this Court finds that the Clerk's accounting system, which has given Shvets credit for more than $241,958 in payments by her co-defendants, is fair and appropriate. With these credits Shvets still owes more than $3,645 in restitution; therefore, her motion for satisfaction of judgment is denied.

## II. BACKGROUND

### A. Factual and Procedural Background

On March 21, 2012, Shvets was indicted for her role in a large-scale health care fraud scheme. *See* ECF No. 1. On March 25, 2014, she was convicted of conspiracy to commit

Medicare fraud and seven counts of health care fraud following a nine-day jury trial. The Honorable Eduardo C. Robreno sentenced Shvets on August 5, 2014, to fifteen months imprisonment, three years supervised release, an $800 special assessment, and restitution in the amount of $253,196. *See* ECF No. 210. The criminal judgment provides that Shvets is jointly and severally liable for the restitution amount with eight other defendants. *See id.* "[H]er $253,196 share represented only part of a broader scheme that allegedly caused $16.2 million in loss to Medicare. Two of the defendants held jointly and severally liable with Shvets were ordered to pay for the scheme's entire loss. In total, seventeen individuals associated with the scheme were ordered to pay restitution for varying amounts from $42,211 to $16.2 million." Circuit Opn. 3, ECF No. 559. Judgment was affirmed. *See* ECF No. 365.

Shvets was directed to begin restitution payments immediately, to pay a minimum of $25 per quarter through the Inmate Financial Responsibility Program during the period of confinement, and to make monthly payments of $100 while on supervised release. *See* ECF No. 210. The first restitution payment made by Shvets on November 3, 2016, in the amount of $60 was received more than two years after her sentencing hearing. *See* Gov't Ex. 6. For the following six months she made monthly restitution payments of $100. *See id.* She made only $10 monthly payments for the seventeen months thereafter. *See id.* Additionally, three restitution payments totaling $6,561.88 were received through the Treasury Offset Program. *See* Gov't Ex. 3. Her last restitution payment, which was through the Treasury Offset Program, was received on October 28, 2019. *See id.* Shvets has made no further restitution payments.

On February 8, 2021, Shvets filed a Motion for Accounting and Satisfaction of Judgment. ECF No. 473. She asked the Court "to declare her restitution judgment satisfied based on

payments that she and her co-defendants had made.[1] Although Shvets had not personally paid all of the amount ordered by her judgment, she urged that payments by herself and others (with whom she was jointly and severally liable) had totaled more than that amount, so that the judgment was satisfied." Circuit Opn. 3. After receiving documentation from the Government and holding two hearings,[2] Judge Robreno determined that Shvets's restitution judgment had not been satisfied. *See id.* He issued an Opinion and Order dated August 30, 2022, denying Shvets' motions for accounting and satisfaction of judgment. *See* ECF Nos. 541-542. Shvets appealed. *See* ECF No. 543.

The case was thereafter reassigned to the Undersigned. *See* ECF No. 554. On September 29, 2025, the Third Circuit Court of Appeals issued an Opinion affirming in part[3] and vacating in part the August 30, 2022 Order and remanding for a determination as to "whether the Clerk's system (or an alternative system, if the District Court determines an alternative system would be preferable) is appropriate and fair, and to determine whether, under that system, Shvets's judgment has been satisfied." *See* ECF No. 559; *United States v. Shvets*, 154 F.4th 74, 86 (3d Cir. 2025) ("On the present record, we are unable to determine whether Shvets's restitution obligation has been satisfied. While the Clerk has obviously adopted a method for calculating Shvets's outstanding balance as $18,929.69, the facts are not sufficiently developed to understand how that determination was made, nor are we able to ascertain on appeal whether the Clerk's method was reasonable.").

---

1 *See* Mot., ECF Nos. 473; Resp., ECF No. 485; Supp. Resp., ECF Nos. 522, 535.

2 *See* Transcripts, ECF Nos. 499, 525, 528.

3 This Opinion does not address those portions of Judge Robreno's decision that were affirmed and, instead, incorporates those parts of his decision and the Third Circuit's opinion.

This Court held an evidentiary hearing on May 6, 2026, to ascertain how the Clerk has been accounting for restitution payments by the home care hospice Defendants so that it may make an informed decision as to whether the Clerk's allocation methodology was appropriate and fair and whether the Defendant's restitution judgment has been satisfied. *See* Hearing Transcript, N.T. ___,[4] ECF No. 576. Post-hearing briefs were filed by both parties on May 20, 2026. *See* Gov't Mem., ECF No. 574; Shvets Mem., ECF No. 575.

**B. Evidentiary Hearing May 6, 2026**

John Bullock, the financial manager of the fiscal or financial department for the Clerk's Office of the United States District Court Eastern District of Pennsylvania, testified at the evidentiary hearing. Mr. Bullock has worked for this Court in that position since September 2019. *See* N.T. 11:12-17. In his prior employment, Mr. Bullock, a CPA, worked in public accounting, specifically litigation support, for approximately twenty-two years for a number of accounting firms. *See id.* 2:5-10. As financial manager for this Court, Mr. Bullock handles "anything financial related to the Clerk's Office." *Id.* 12:11-15. He supervises approximately nine employees on a daily basis and oversees, *inter alia*, "all of the financial transactions and activity for the Court, and this could be the acceptance and payment of criminal debt, deposits or withdrawals into our registry funds, [and] payment of various vouchers." *Id.* 11:18-24, 13:9-11. He explained that the "finance department is here to make sure that we properly account for all financial transactions. . . , which we do on a daily and monthly basis. We're continuously balancing out and ultimately prepar[ing] for an external audit where external auditors come in and actually go over all of our processes and our numbers." *Id.* at 12:18-24.

---

4 All references to the "evidentiary hearing" and to "N.T." are to the evidentiary hearing on May 6, 2026, unless otherwise noted.

Mr. Bullock's department is responsible for handling the processing and receipt of payments made by criminal defendants, accounting for those payments, and dispersing restitution to victims in criminal cases, all in accordance with established policies and procedures of the Administrative Offices of the United States Courts ("AO"). *See id.* at 13:1 – 14:2. His department uses a standardized accounting system (software) that was established by the AO. *See id.* at 14:3-6. The Guide to Judiciary Policy also includes a section for the financial department explaining how to treat joint and several relationships, and every member in the Clerk's Office finance department must watch a three-hour training video entitled Mapping of Joint and Several Restitution. *See id.* at 54:9-24. The Clerk's system accounts for restitution payments for a defendant that were made by a co-defendant in cases of joint and several liability, as well as direct payments to the victim(s). *See id.* at 14:10-23. The procedures used by the Clerk's Office here are the same as those used in other courts. *See id.* at 44:22-25.

Under this procedure, the Clerk's Office first maps out all the joint and several relationships according to the judgments for each defendant. *See* N.T. 28:6-9; 31:11-18; 74:1-4;[5] Gov't Ex. 5. Mr. Bullock explained that once he and his staff receive all the judgments in a criminal case,[6] they "start to review them for the joint and several relationships, and . . . create . . . a mapping schedule." *See id.* at 31:11-14.

---

[5] Mr. Bullock testified:

> So what me and my staff do, once we receive all the judgments in a criminal case, we start to review them for the joint and several relationships, and what I'll call – we create what I'll call a mapping schedule. So we identify all of the cases, all of the defendants, the date of the sentencing, the amount of restitution they owed, and then we start to identify all of the other cases and defendants that have been identified as joint and several with that individual defendant.

N.T. 31:11-18.

[6] Mr. Bullock explained that "quite frequently" in cases with multiple defendants, the judgments do not always crossmatch but they are still able to map out the joint and several relationships. *See* N.T. 32:20-25. In such a situation, Mr. Bullock or his staff "will go back to

The next step, which cannot begin until all defendants have been sentenced, is to build the financial relationships by creating "buckets." *See id.* at 19: 13-14, 33:25 – 34:3. The buckets "ensure that no defendant pays more than the ordered amount on their judgment in a criminal case," and the victim receives no more than what is owed. *See id.* at 34:14-16; 35:20-25. The Clerk's Office creates buckets by establishing the financial relationships among all jointly and severally liable defendants, matching the specific restitution amounts on the judgments. *See id.* at 24:13-19, 28:9-17; 74:5-7; Gov't Ex. 5. Mr. Bullock and his staff start with the defendant with the lowest amount of restitution, which in the instant action is Edward Hearn owing $42,211. *See id.* at 34:17-18. This defendant is listed first on the vertical axis of the Mapping schedule printed in Government's Exhibit 8, and this defendant's restitution amount becomes bucket A on the horizontal axis. *See* N.T. 34:18-21; Gov't Ex. 8.[7] Any co-defendant that is jointly and severally liable with Hearn is marked under bucket A.[8] *See* N.T. 34:21-25; Govt' Ex. 8. The next defendant on the vertical axis is the defendant with the second lowest restitution order, which in this case is Zoya Shusterman owing $118,880. *See* Govt' Ex. 8. Because Shusterman was jointly and severally liable in bucket A with Hearn, bucket B ($76,669) is the difference between the amount owed in bucket A and Shusterman's total restitution order.[9] *See*

---

chambers and . . . go back to the United States Attorney's Office and identify them of the issues" so that corrective action can be taken if needed. *See id.* at 33:9-13.

7 Government's Exhibit 8 is attached to this Opinion.

8 Except for bucket A and Hearn, because he is first, none of the buckets can be associated with only one person. *See* N.T. 60:9-12.

9 Although the same simple math applies to Bucket C because the defendant with the third smallest restitution order is also in Buckets A and B, the defendant with fourth smallest restitution order is not in Bucket A and has different joint and several relationships. *See* Gov't Ex. 8. Importantly, however, the amount of the individual buckets that each defendant occupies is equal to that defendant's restitution order. *See id.* Mr. Bullock explained: "you have to look at it from the ordered restitution and then start going out to the right. And every time a defendant appears in the bucket, we take the ordered restitution less the financial amount of that particular

*id.*; N.T. 42:1-4. Any co-defendant that is jointly and severally liable with Shusterman is marked under bucket B. *See* Govt' Ex. 8. This process continues for each defendant until all restitution orders are listed and all joint and several relationships are marked. *See id.*; N.T. 42:5-7. Mr. Bullock explained: the goal "is to eliminate a defendant each time we create a bucket. That's why you see bucket amounts ranging from the millions down to a couple thousand, because it all depends on, mathematically, how does it work out." *See* N.T. 40:14-19.

The Clerk's Office then confirms the accuracy of the process by balancing out the buckets. *See* Gov't Ex. 5. Mr. Bullock explained: "If you subtract the two numbers [Hearn's restitution order and bucket A], you have a zero. And then that confirms to us that Mr. Hearn is only in bucket A." *See id.* at 41:18-22. As an accounting check, each bucket is assigned a percentage showing what percentage that bucket amount is in relation to the total restitution amount owed to the victim (here, $16.2 million), and all bucket percentages equal 100%. *See* N.T. 36:6-19; Gov't Ex. 8. The Clerk's accounting system ensures that the victim receives no more than what is owed, specifically here it ensures that Medicare receives no more than $16.2 million. *See* N.T. 36:17-25.

The Clerk's Office's accounting system also ensures that a defendant receives credit not only for the restitution payments that defendant makes directly, but also for payments made by a joint and several co-defendants. *See* N.T. 25:1-5. This includes payments made to the Clerk's Office and to the victim directly. *See id.* at 26:21 – 27:1. When a defendant makes a restitution payment, the payment is allocated to all the buckets in which that defendant has joint and several

---

bucket. And then we put the result in the bucket." *See* N.T. 41:14-22. There are procedures that ensure the accuracy of the Clerk's calculations. *See id.* at 43:3-14.

liability.[10] *See id.* at 38:5-10. Once a bucket is satisfied (the restitution amount in the bucket is paid in full), any payment is applied to the remaining buckets. *See id.* at 38:8-13. For example, because Shusterman is in buckets A and B, any payment she makes is applied to both buckets. *See* N.T. 36:1-5. Once one of those buckets is satisfied (bucket A, for example), any payment by Shusterman is applied to the other bucket only (bucket B in this example).[11] *See id.* at 36:10-13. The same applies to all co-defendants: a payment by a co-defendant is applied to all unsatisfied buckets for that co-defendant and that co-defendant's payment reduces the amount in those buckets, which in turn reduces the amount all other co-defendants in that bucket owe. *See id.* at 36:18-25.

In allocating a payment, the Clerk's system looks at the outstanding balance of all the unsatisfied buckets in which the paying defendant has a joint and several relationship, and then proportionally applies the payment to each of the outstanding balances. *See id.* at 45:25 - 46:4. For example, as of May 4, 2026, Shvets owes a total of $3,645.17 over buckets G and H,[12] with buckets A through F having been satisfied. *See* Gov't Ex. 10. The balance in bucket G is $695.24, which is 19.06% of the total owed for the two buckets. *See id.* Thus, if Shvets made a $100 restitution payment, $19.06 would be applied to bucket G and the remaining $80.94 would be applied to bucket H. *See* N.T. 46:13-21. This allocation is applied to all payments until each bucket for which the paying defendant has joint and several liability is satisfied and the

---

10 If any restitution payments are made prior to the buckets being set up, they are accounted for in the system and then later moved into the appropriate bucket. *See* N.T. 19:7-24.

11 The buckets are not necessarily satisfied in alphabetical order because each bucket has different joint and several liability relationships. It is possible that the co-defendants in bucket B, for example, make greater payments than the co-defendants in bucket A, thereby satisfying bucket B first.

12 Bucket G has a balance of $695.34 and bucket H has a balance of $2,929,83, totaling $3,645.17. *See* Gov't Ex. 10. Once these amounts are paid, the buckets will be satisfied.

defendant's balance in those buckets is paid in full. *See id.* at 38:5-9. The Clerk's system ensures that a defendant pays no more than the defendant's individual judgment amount,[13] and receives credit for payments made by joint and several co-defendants. *See id.* at 49:1-13; 51:2-4.

The Clerk's accounting system generates a case inquiry report for all transactions for a particular defendant. *See* N.T. 17:9-16. Mr. Bullock testified about the Case Inquiry Report for Shvets. *See* Gov't Ex. 2.[14] The Report for Shvets in the above-captioned case shows her special penalty assessment of $800 and bail (treasury registry) of $5,000, as well as her restitution obligation of $253,196 for which she is jointly and severally liable with eight co-defendants.[15] *See id.* 18:9 – 19:6, 23:22 -24:16; Gov't Ex. 2. Shvets' joint and several restitution obligation is broken down into eight individual buckets, labeled A through H.[16] *See id.* Because Shvets is in buckets A through H, her payments were applied to all those buckets that were not yet satisfied. *See id.* at 36:2-13. Shvets made restitution payments between November 2016 and October 2019

---

13 The accounting system catches overpayments. Mr. Bullock explained, by way of example, that if Shvets, whose balance is $3,645.17, makes a $4,000 payment, the system would indicate an error when the payment is imported, requiring he or his staff to determine the source of the error. *See* N.T. 49:1-13. He would then determine that there was an overpayment made, create an overpayment line on that case, and notify chambers and the U.S. Attorney's Office so the overpayment could be returned. *See id.*

14 Government's Exhibit 2 is attached to this Opinion.

15 There were twenty co-defendants involved in the large healthcare fraud scheme, which lasted from approximately January 2003 until December 2008, but Shvets, whose conspiracy began in or about January 2005, is jointly and severally liable with only eight co-defendants. *See* N.T. 23:22 – 24:7; Gov't Ex. 4; ECF No. 1 (Indictment). Three of the twenty co-defendants were not ordered to pay any restitution and the remaining seventeen had various restitution orders. *See* N.T. 30:15 – 31:2; Gov't Ex. 4. The restitution orders and payments, both direct and joint and several credits, are tracked by the Clerk's Office for all seventeen defendants. *See* Gov't Ex. 4. As of April 24, 2026, $13,361,422.90 has been paid on the total restitution order of $16,200,000, leaving a balance of $2,838,577.10. *See id.*

16 The labels A-H are reflected under the joint and several account number (JS Account #) on the Case Inquiry Report. *See* Gov't Ex. 2. Mr. Bullock explained all of the columns and codes on the Report, but this Opinion focuses only on what is necessary to decide the issues here.

totaling $7,591.88.[17] *See* Gov't Exs. 3-4. To date, she has not made any other restitution payments. *See id.*; N.T. 84:19-22. As of May 4, 2026,[18] Shvets also received credit toward her restitution obligation from payments made by joint and several co-defendants totaling $241,958.95.[19] *See* Gov't Ex. 4;[20] N.T. 25:21 – 26:3. In total, $249,550.83 has been paid toward her restitution obligation of $253,196, leaving a balance of $3,645.17.[21] *See id.*

Shvets also testified at the hearing.[22] She alleged that the "Clerk did not use its regular system on my debt. He changed the system for one debtor. . . . Every debtor was put into this bucket system except one, Svetlana Ganetsky." N.T. 76:14-24. Shvets claimed that "the Clerk never mapped [Ganetsky's] judgment." *Id.* 77:11. However, this testimony was contradicted by

---

17 More than $6,500 of these payments were received through the Treasury Offset Program from the United States Treasury on Shvets' behalf, specifically related to income tax refunds. *See* N.T. 21:13 – 22:10; Gov't Ex. 3. Mr. Bullock explained that the Treasury Offset Program was established to take a portion of any payment coming from the federal government, such as income tax refunds, Social Security payments, and disability payments, to a defendant owing a criminal debt. *See* N.T. 21:19 – 22:2.

18 These amounts are accurate as of May 4, 2026, when Mr. Bullock printed the Case Inquiry Report. *See* Gov't Ex. 4. Mr. Bullock testified that in preparation for the May 6 evidentiary hearing, he checked to see that all restitution payments were reflected in the report and that the last restitution payment by one of the seventeen co-defendants was received on April 24, 2026. *See* N.T. 23:5-21.

19 Those payments include civil case settlements, which went directly to Medicare, for two of Shvets' joint and several co-defendants totaling $12,286,480.55, as well as a payment from the Department of Justice related to one of these joint and several co-defendants in the amount of $237,500. *See* Gov't Ex. 4; N.T. 26:18 – 27:15. As explained above, these payments were allocated over all the buckets for which the paying co-defendant was jointly and severally liable.

20 Government's Exhibit 4 is attached to this Opinion.

21 *See* footnote 19 *supra*.

22 All references to the evidence produced at the hearing prior to this point in the Opinion are based on the testimony of John Bullock, whose testimony is found to be credible and is accepted as fact. The Court makes this credibility determination after having listened to the testimony of Mr. Bullock and having viewed his demeanor. The Court finds, *inter alia*, that he is knowledgeable in finances, well-trained and experienced in the area of the Clerk's restitution procedures, his account was believable, and his testimony was consistent throughout and was supported by the documentary evidence.

The testimony of Shvets, on the other hand, is based largely on her misunderstanding of the Clerk's process and exhibits, and upon unfounded assumptions.

Mr. Bullock, who attested that Ganetsky was originally mapped to several buckets (buckets B, J, K, L, and M) and is in the Clerk's system. *See id.* at 59:20-21, 62:6-12, 69:8-15. Government Exhibit 7 confirms that Ganetsky was mapped. *See* Gov't Ex. 7.[23] Although Government Exhibit 8 does not include Ganetsky, Mr. Bullock explained that this schedule "is not coming from our accounting system. [He] created this schedule, merely for these hearings." *See* N.T. 75:1-3. By the date of the hearings, Ganetsky's criminal debt had been satisfied by the civil payment so Mr. Bullock decided not to include her in the mapping documents *created for* the evidentiary hearings. *See id.* at 59:17-19, 61:10-15.

Shvets argued, over the objection of Government counsel, *see id.* at 66:10-17,[24] that although her written judgment does not list Ganetsky as a joint and several co-defendant, the oral sentence does.[25] *See id.* at 76:24 – 77:2 (asserting that because there is a discrepancy in the restitution order between her written judgment and the Judge's order at sentencing, the Court must follow the sentence as pronounced orally in court). She contends that had this relationship been mapped, Ganetsky's restitution payment would have been applied to satisfy the buckets she shared with Shvets. *See id.* at 77:17-19. Shvets asserts that if the civil settlement for Ganetsky and Pugman, who are husband and wife, had been allocated as a payment from Ganetsky, as

---

23 Government's Exhibit 7 is attached to this Opinion.

24 Government counsel stated:

> I want to object to the extent that Ms. Ganetsky is trying to now argue that there somehow is a $250,000 payment that's not accounted for. That issue was addressed by the Third Circuit in its decision in this case, that all payments have been properly accounted for. The only issue before this Court right now is whether or not those payments received by Mr. Bullock's office were properly credited towards her account.

N.T. 66:10-17.

25 When pronouncing Shvets' sentence in court, the Judge named Ganetsky as being jointly and severally liable, *cf.* Sent. N.T. 58:18-23, 61:2-10, ECF No. 265, but the written judgment excludes Ganetsky, *with* Gov't Ex. 1; ECF No. 210.

opposed to Pugman,[26] it would have been spread over fewer buckets in much larger amounts and would have satisfied Shvets' restitution obligation. *See id.* at 78:1-10. Notably, the Clerk's Office had no information as to whether Ganetsky or Pugman made the particular payment as it was paid to Medicare directly. *See id.* at 75:18-24.

## III. LEGAL STANDARD

"The purpose of restitution under the MVRA [Mandatory Victims Restitution Act] is to compensate the victim for its losses and, to the extent possible, to make the victim whole." *United States v. Diaz*, 245 F.3d 294, 312 (3d Cir. 2001). "The MVRA requires restitution be ordered for the 'full amount' of each victim's loss." *United States v. Bryant*, 655 F.3d 232, 254 (3d Cir. 2011) (citing 18 U.S.C. § 3663(f)(1)(A)). The Government has the burden of proving the amount of the victim's loss by the preponderance of the evidence. *See id.*; 18 U.S.C. § 3664(e). The defendant has the burden of demonstrating his/her financial resources and the financial needs of his/her dependents, as well as "[t]he burden of demonstrating such other matters as the court deems appropriate." 18 U.S.C. § 3664(e). Specifically, it is the defendant's burden to contest restitution payments, to dispute amounts the Government may have collected from a third party, to prove offsets for compensation the victim may have received from another source, and to show that there were additional payments not on the accounting. *See Shvets*, 154 F.4th at 99; *Bryant*, 655 F.3d at 254; *United States v. Sims*, Nos. 99-CR-234, 99-CR-234, 98-CR-594, 2003 U.S. Dist. LEXIS 9835, at *13 (E.D. Pa. May 30, 2003) ("It is logical to place the burden for proving a restitution credit upon the defendant when it is the defendant who seeks to lower the outstanding restitution balance.").

---

[26] Mr. Bullock testified that Shvets received credit for the civil settlement through Pugman, as did all the co-defendants with whom he had joint and several relationships. *See* N.T. 62:20 – 63:1.

The "MVRA itself does not specify how to count restitution payments." *Shvets*, 154 F.4th at 91. "[T]here is not one, generally applicable rule under the MVRA for how to count payments toward hybrid restitution orders. That gap must be filled by the sentencing court's discretion." *Id.* at 92 (citing *United States v. Salti*, 59 F.4th 1050, 1056-57 (10th Cir. 2023), *cert. denied* 144 S. Ct. 153 (2023)). The "district court has wide discretion to apply payments in a way that reasonably comports with 'language in [the] judgment[s]' and is 'fair.'" *Id.* (quoting *Salti*, 59 F.4th at 1056-57). This "wide flexibility [is not intended] to place a heavy burden on sentencing judges." *Id.* at 94. "[I]n practice, hybrid restitution payments are frequently counted using software promulgated to district court clerks' offices by the Administrative Office of U.S. Courts (AO), as was done in this case." *Id.* at 92. Whether the Clerk's system produces unfair results in certain situations is left to the discretion of the sentencing judge. *See id.* at 92-93 (refusing to "say that the Clerk's system or another system is preferable in all cases"). "[T]he fact that a defendant may view an alternative system as more fair will not be grounds for upsetting the sentencing judge's determination so long as the system used is also within the wide range of fairness. The sentencing judge does not need to choose the best possible system in each case, only a fair system it views as appropriate." *Id.*

## IV. ANALYSIS

Initially, the Court notes that the validity of Shvets' restitution judgment is not at issue here. *See Shvets*, 154 F.4th at 91 ("The District Court acted within its discretion in imposing a hybrid restitution as such an approach reasonably comports with the 'language in [the] judgment' and is 'fair.'" (quoting *Salti*, 59 F.4th at 1056-57)). Instead, the issues are: (1) how restitution payments are counted toward the judgments of Shvets and her co-defendants; (2) whether the method used by the Clerk's Office in allocating payments is fair and appropriate; and (3)

whether Shvets's restitution judgment remains outstanding. *See id.* at 96-98 (declining to "dictate precisely what information the District Court needs to ascertain on remand" provided that it obtains the information necessary "to make an informed decision as to whether the Clerk's allocation methodology was appropriate and fair and whether, under an appropriate methodology, Shvets's restitution judgment has been satisfied").

**A. The request to reallocate credit to Shvets for the 2015 civil settlement as a payment from Ganetsky is dismissed and denied.**

The Government's objection to Shvets's claim that Ganetsky's civil settlement payment was not accounted for, *see* N.T. 66:10-17, is sustained. The Government argues that the claim is not before this Court because the Third Circuit Court of Appeals already addressed whether all payments had been properly accounted for. *See id.* The Government is correct. On appeal, the Third Circuit considered "the specific items of property that Shvets claims entitle her to additional restitution credit." *See Shvets*, 154 F.4th at 99-101. Notably absent from the items considered was Ganetsky's civil settlement payment because Shvets failed to properly present the matter to the Third Circuit Court of Appeals. *See id.* at 101 n.11 (refusing to consider Shvets's argument presented for the first time in her reply brief that some payments the Clerk attributed to Pugman should be reallocated to Ganetsky). It was only because the Third Circuit Court of Appeals was unable to understand the Clerk's accounting system that it could not "ascertain on appeal whether the Clerk's method was reasonable." *See id.* at 86. It was "[f]or these reasons" that the matter was remanded "for the District Court to decide whether the Clerk's system (or an alternative system, if the District Court determines an alternative system would be preferable) is appropriate and fair, and to determine whether, under that system, Shvets's judgment has been satisfied." *Id.* Because the remand was limited to this issue, Shvets's argument that the civil settlement was not correctly accounted for is not properly before this

Court. *See United States v. Bagdis*, 591 F. App'x 129, 131-32 (3d Cir. 2014) (holding that to the extent the defendant failed to raise certain arguments in the first appeal they were waived and "it would have been improper for the District Court to address the issues because they [we]re outside the limited scope of our remand order"). The request to reallocate the payment is therefore dismissed for lack of jurisdiction.

Even if the claim was properly before this Court, it would be denied because Shvets has failed to establish that she did not receive credit for the civil settlement, which was logged by the Clerk's Office as a restitution payment by Pugman. *See Bryant*, 655 F.3d at 254 ("In other cases where offsets are claimed, such as for compensation that the victim gets from other sources, other Courts of Appeals have concluded that it is the defendant's burden to prove those offsets."). Significantly, the Clerk's Office had no information as to whether Ganetsky or Pugman, husband and wife, made the payment because the civil settlement included both and was paid to Medicare directly. *See* N.T. 75:18-24. For this reason and because Pugman was jointly and severally liable with eleven co-defendants and Ganetsky was jointly and severally liable with only five, all of whom were among the eleven,[27] the Clerk's Office credited the civil settlement as a payment from Pugman. *See* N.T. 62:13 – 63:1. This ensured that all eleven joint and several co-defendants received credit for the payment toward their restitution obligations. This Court finds that this allocation was fair and appropriate. *See Shvets*, 154 F.4th at 93

[27] *Cf. United States v. Pugman*, No. 2:09-cr-00651 (E.D. Pa. filed Sept. 30, 2009) at ECF No. 46 (listing the following Defendants as jointly and severally liable: Matthew Kolodesh, 11-464; Svetlana Ganetsky, 09-652; Eugenia Roytenberg, 11-84; Lioudmila Novikov, 11-189; Diana Koltman, 11-182; Cecelia Wiley, 11-322; Edward Hearn, 11-297; Giorgi Oqroshidze, 12-112-03; Yevgeniya Goltman, 12-112-04; Natalya Shvets, 12-112-02; and Alexsandr Kotyakov, 12-112-05), *with Ganetsky*, No. 2:09-cr-00652 at ECF No. 50 (listing the following joint and several co-defendants: "Matthew Kolodesh, 11-464A $405, 184.00; Alex Pugman, 09-651; $405, 184.00; Lioudmila Novikov, 11-189; $405, 184.00; Eugenia Roytenberg, 11-84; $405,1114.00; Diana Koltman, I 1-182; $405,184.00").

(holding that the court "does not need to choose the best possible system in each case, only a fair system it views as appropriate"). Shvets's argument that she would have received a greater portion of the civil settlement payment if it had been allocated as payment by Ganetsky, instead of Pugman, is insufficient to require reallocation. *See Shvets*, 154 F.4th at 92-93 ("[T]he fact that a defendant may view an alternative system as more fair will not be grounds for upsetting the sentencing judge's determination so long as the system used is also within the wide range of fairness. The sentencing judge does not need to choose the best possible system in each case, only a fair system it views as appropriate."). Rather, Shvets's request to reallocate the restitution payment simply in an attempt to lessen her own restitution obligation would contradict the purpose of restitution, which is to make the victim whole. *See Salti*, 59 F.4th at 1057 (refusing to refund the defendant after paying his restitution order in full - based on an overlapping restitution payment by a joint and several co-defendant that the Clerk's Office applied pro rata to the amount owed by the defendant - because a refund would take money away from the victim and there is no unfairness to the defendant who paid no more than he was ordered).

Moreover, reallocating the 2015 civil settlement as a payment from Ganetsky is not a simple, uncontroversial task.[28] Initially, the portions allocated to Shvets and all of Pugman's

[28] Before any reallocation, Shvets's criminal judgment, which does not list Ganetsky as a jointly and severally liable co-defendant, would have to be amended pursuant to Rule 36 of the Federal Rules of Criminal Procedure. *See United States v. Bennett*, 423 F.3d 271, 277-78 (3d Cir. 2005) (stating that Rule 36 allows a court to correct clerical errors in the judgment and explaining that a "'clerical error involves a failure to accurately record a statement or action by the court or one of the parties'" (quoting 26 James Wm. Moore et al., Moore's Federal Practice P 636.02[2] (3d ed. filed through 2005)). However, "Rule 36 covers only minor, uncontroversial errors." *United States v. Werber*, 51 F.3d 342, 347 (2d Cir. 1995). Because an amendment and reallocation would not be simple or uncontroversial, and because Shvets received credit toward her restitution obligation for the civil settlement payment to Medicare, a retroactive amendment and reallocation is not necessary to prevent injustice. *See United States v. Sumner*, 226 F.3d 1005, 1009-10 (9th Cir. 2000) ("The power to amend nunc pro tunc is a limited one, and may be

other jointly and severally liable co-defendants would have to be eliminated. Although five of these co-defendants would be given additional credit based on their joint and several relationship with Ganetsky, the six co-defendants who do not share such a relationship with Ganetsky, some of whom are no longer on supervised release, would be without recourse to challenge the reduction.[29] An amendment at such late date would cause unfair surprise, especially to those co-defendants whose restitution obligations were deemed satisfied years earlier.[30] These would not be the only adjustments necessitated by reallocating the civil settlement payment to Ganetsky. Rather, all subsequent restitution payments by Pugman or by his eleven joint and several co-defendants or by any other co-defendant in a joint and several relationship with any one of these defendants would be impacted because payments are allocated to all the buckets in which the paying defendant has joint and several liability and are applied proportionally based on the outstanding balances in the buckets. *See* N.T. 38:5-10, 45:25 - 46:4. The credits to Shvets' joint and several co-defendants from Shvets's own restitution payments (all of which were made between November 2016 and October 2019) would also be either reduced or eliminated entirely (if Ganetsky's payment satisfied Shvets's restitution obligation). For all these reasons, reallocating the 2015 civil settlement as a payment from Ganetsky would produce an unfair

used only where necessary to correct a clear mistake and prevent injustice." (quotations omitted)).

[29] Shvets, on the other hand, could have raised the discrepancy between her oral sentence and written judgment on direct appeal more than a decade ago but chose not to. *See* ECF No. 213 (Notice of Appeal filed August 13, 2014).

[30] Such "unfair surprise" makes use of Rule 36 improper. *Accord United States v. Grasso*, 376 F. App'x 166, 168 (3d Cir. 2010) (affirming the district court's use of Rule 36 to amend the sentence where "there was 'no unfair surprise, no dispute about the dollar amount of forfeiture, and no suggestion that anyone else [was] entitled to keep the money'" (quoting *Bennett*, 423 F.3d at 281)). *See also United States v. Shor*, No. 10-CR-00434, 2012 U.S. Dist. LEXIS 104399, at *3 (N.D. Cal. July 26, 2012) (denying the motion to amend judgment under Rule 36 to correct a discrepancy in the court's judgments regarding the amount of forfeiture because, *inter alia*, "the revision could adversely impact claimant's interests" in the property).

result. *See United States v. Bennett*, 423 F.3d 271, 282 (3d Cir. 2005) (Rule 36 may be used where "there is no dispute about notice to the defendant, the court's intent, or the *propriety of the result*." (emphasis added)). *See also Shvets*, 154 F.4th at 90 n.3 (explaining that "the Government, in its prosecutorial discretion, could have declined to pursue any of Shvets's co-defendants for restitution, making it doubtful Shvets would have a property right to credit for their payments sufficient to trigger due process protections").

Shvets's request to reallocate the 2015 civil settlement is dismissed and denied.

**B. The Clerk's accounting system is fair and appropriate.**

The system of the Eastern District of Pennsylvania's Clerk's Office for the processing and receipt of payments made by criminal defendants, accounting for those payments, and dispersing restitution to victims in criminal cases is in accordance with established policies and procedures of the AO. *See* N.T. 13:1 – 14:2. Not only does the Clerk's Office use the AO's standardized accounting system (software), *see id.* at 14:3-6, its employees are familiar with the section in the Guide to Judiciary Policy on how to treat joint and several relationships and are required to watch a three-hour training video entitled Mapping of Joint and Several Restitution, *see id.* at 54:9-24; https://jnet.ao.dcn/financial-management/financial-management-training/accounting-and-finance#d/MappingCriminalDebt:Joint&SeveralRestitution. The procedures used by the Clerk's Office here are the same as those used in other courts. *See* N.T. 44:22-25. Accordingly, Shvets's suggestion that the "Clerk did not use its regular system on my debt," *see* N.T. 76:14-24, is wholly without merit.

Pursuant to these established procedures, which are detailed above, once the Clerk's Office receives all the judgments in a criminal case, the defendants are reviewed and "mapped" for joint and several relationships. *See id.* at 31:11 – 34:3. The Clerk's Office then creates

"buckets" by establishing the financial relationships among all jointly and severally liable defendants, matching the specific restitution amounts on the judgments.[31] *See id.* at 24:13-19, 28:9-17; 74:5-7; Gov't Ex. 5. This process ensures that the Clerk can "apply payments in a way that reasonably comports with 'language in [the] judgment[s].'" *See Shvets*, 154 F.4th at 91 (quoting *Salti*, 59 F.4th at 1056-57). Additionally, the Clerk's buckets "ensure that no defendant pays more than the ordered amount on their judgment in a criminal case," that all co-defendants who are jointly and severally liable receive credit, and that the victim receives no more than what is owed. *See* N.T. 34:14-16; 35:20-25, 49:1-13; 51:2-4.

When a defendant makes a restitution payment,[32] the Clerk's system looks at the outstanding balances of all the unsatisfied buckets in which the paying defendant has a joint and several relationship, and then proportionally applies the payment to each of the outstanding balances, meaning that each defendant in a joint and several relationship with the paying defendant who has an outstanding restitution balance receives credit for the payment. *See* N.T. 38:5 - 46:4. Applying the payments proportionally affords the paying defendant the most credit, while also compensating the victim and giving credit to joint and several co-defendants. The Court finds that this system produces fair results. *See Shvets*, 154 F.4th at 92-93 (stating that it is in the discretion of the sentencing judge to determine whether the Clerk's system produces fair results). The Clerk's system is also consistent with the purpose of restitution under the MVRA,

---

[31] The Clerk's Office confirms the accuracy of the process by balancing out the buckets and assigning each a percentage in relation to the total restitution amount owed to the victim. *See* N.T. 36:6-19; Gov't Exs. 5 and 8.

[32] The Clerk's system accounts and credits jointly and severally liable co-defendants for restitution payments made to the Clerk's Office and to the victim directly. *See* N.T. 25:1-5, 26:21 – 27:1.

which "is to compensate the victim for its losses and, to the extent possible, to make the victim whole." *See Diaz*, 245 F.3d at 312.

**C. Shvets's restitution judgment has not been satisfied.**

Since Shvets was sentenced more than a dozen years ago, she has personally paid $7,591.88 toward her restitution obligation of $253,196.[33] Her payments are less than 3% of the restitution order, which in the civil context would not entitle her to contribution from co-defendants. *See Salti*, 59 F.4th at 1057 (Although the policies underlying restitution law are not identical to those underlying tort law, "we think it relevant that in the tort context a defendant who is jointly and severally liable with other defendants is not entitled to contribution from the others until he has paid more than his apportioned share of the liability." (citing *Paroline v. United States*, 572 U.S. 434, 453-54 (2014); *Northw. Airlines, Inc. v. Transp. Workers Union of Am.*, 451 U.S. 77, 87-88 (1981)). However, because this Court finds the Clerk's system to be fair and appropriate for the reasons discussed above, it credits Shvets for payments made by joint and several co-defendants totaling $241,958.95, which leaves a balance of $3,645.17. Eliminating this balance would not serve the purpose of restitution, which is to compensate the victim. *See* 18 U.S.C. § 3663(f)(1)(A)); *Diaz*, 245 F.3d at 312.

Shvets's decision to unilaterally stop making restitution payments after October 2019, which was in violation of the terms of her supervised release,[34] also conflicts with the purpose of restitution. She will therefore be directed to resume monthly payments immediately and shall

---

[33] As previously explained, these amounts are accurate as of May 4, 2026, when Mr. Bullock printed the Case Inquiry Report. *See* Gov't Ex. 4. To the extent any joint and several co-defendant has made additional payments, Shvets received credit.

[34] Shvets received no consequences for the violation before her term of supervised release expired.

continue making regular monthly payments until she is advised that her restitution obligation has been satisfied.

## V. CONCLUSION

The Eastern District of Pennsylvania Clerk's Office uses a standard accounting system in accordance with the procedures and training from the AO to record and allocate criminal restitution payments. This system tracks all restitution payments and credits the paying defendant, as well as all joint and several co-defendants, in accordance with the criminal judgments. The method of allocation is reasonable and fair to all defendants and to all victims. The Clerk's system is therefore accepted. According to this system, which this Court finds to be accurate, Shvets, even with credit from joint and several co-defendants, has not yet satisfied her restitution obligation and still owes $3,645.17. Her attempt to be relieved of her restitution obligation totaling more than $250,000 even though she has paid less than $7,600 since she was sentenced more than two decades ago directly conflicts with the purposes of restitution and is rejected. Shvets's Motion for Satisfaction of Restitution Judgment is therefore denied.

A separate order will be issued.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

**U.S. Courts**
**Case Inquiry Report**
**Case Num:** DPAE212CR000112; **Party Num:** 002; **Payee Code:** N/A
**Show Party Details:** Y; **Show Payee Details:** Y; **Show Transactions:** Y

**Case Number** DPAE212CR000112 **Case Title** USA V. SHVETS

**Summary Party Information:**

| Party # | Party Code | Party Name | Account Code | Debt Type | JS Account # | Total Owed | Total Collected | Total Outstanding |
|---|---|---|---|---|---|---|---|---|
| 002 | PAEA027389 | NATALYA SHVETS | PAEAPCCA4597 | SPECIAL PENALTY ASSESSMENT | | 800.00 | 800.00 | 0.00 |
| 002 | PAEA027389 | NATALYA SHVETS | PAEAPCCA4597 | VICTIM RESTITUTION | | 0.00 | 0.00 | 0.00 |
| 002 | PAEA027389 | NATALYA SHVETS | PAEAPCCA4597 | VICTIM J&S RESTITUTION | DPAE209CR000651/A | 42,211.00 | 42,211.00 | 0.00 |
| 002 | PAEA027389 | NATALYA SHVETS | PAEAPCCA4597 | VICTIM J&S RESTITUTION | DPAE209CR000651/B | 76,669.00 | 76,669.00 | 0.00 |
| 002 | PAEA027389 | NATALYA SHVETS | PAEAPCCA4597 | VICTIM J&S RESTITUTION | DPAE209CR000651/C | 2,687.00 | 2,687.00 | 0.00 |
| 002 | PAEA027389 | NATALYA SHVETS | PAEAPCCA4597 | VICTIM J&S RESTITUTION | DPAE209CR000651/D | 68,340.00 | 68,340.00 | 0.00 |
| 002 | PAEA027389 | NATALYA SHVETS | PAEAPCCA4597 | VICTIM J&S RESTITUTION | DPAE209CR000651/E | 5,676.00 | 5,676.00 | 0.00 |
| 002 | PAEA027389 | NATALYA SHVETS | PAEAPCCA4597 | VICTIM J&S RESTITUTION | DPAE209CR000651/F | 2,841.00 | 2,841.00 | 0.00 |
| 002 | PAEA027389 | NATALYA SHVETS | PAEAPCCA4597 | VICTIM J&S RESTITUTION | DPAE209CR000651/G | 17,093.00 | 16,397.66 | 695.34 |
| 002 | PAEA027389 | NATALYA SHVETS | PAEAPCCA4597 | VICTIM J&S RESTITUTION | DPAE209CR000651/H | 37,679.00 | 34,729.17 | 2,949.83 |
| 002 | PAEA027389 | NATALYA SHVETS | PAEAPCCA4597 | TREASURY REGISTRY | | 5,000.00 | 5,000.00 | 0.00 |
| | | | | | | 258,996.00 | 255,350.83 | 3,645.17 |

**Summary Payee Information:**

| Payee/Adr Code | Payee Name | Total Owed | Total Paid | Total Outstanding |
|---|---|---|---|---|
| IPACCMS/1 | CENTER FOR MEDICARE AND MEDICAID SERVICES | 42,211.00 | 42,211.00 | 0.00 |
| IPACCMS/1 | CENTER FOR MEDICARE AND MEDICAID SERVICES | 76,669.00 | 76,669.00 | 0.00 |
| IPACCMS/1 | CENTER FOR MEDICARE AND MEDICAID SERVICES | 2,687.00 | 2,687.00 | 0.00 |
| IPACCMS/1 | CENTER FOR MEDICARE AND MEDICAID SERVICES | 68,340.00 | 68,340.00 | 0.00 |
| IPACCMS/1 | CENTER FOR MEDICARE AND MEDICAID SERVICES | 5,676.00 | 5,676.00 | 0.00 |
| IPACCMS/1 | CENTER FOR MEDICARE AND MEDICAID SERVICES | 2,841.00 | 2,841.00 | 0.00 |
| IPACCMS/1 | CENTER FOR MEDICARE AND MEDICAID SERVICES | 17,093.00 | 16,154.14 | 938.86 |
| IPACCMS/1 | CENTER FOR MEDICARE AND MEDICAID SERVICES | 37,679.00 | 34,407.08 | 3,271.92 |
| PAEA037152/1 | MR.DANIEL YUKHANANOV | 5,000.00 | 5,000.00 | 0.00 |

GOVERNMENT EXHIBIT 2
PENGAD-Bayonne, N.J.

**United States v. Pugman, Kolodesh, et al.**
**Summary of Defendants' Restitution Payments**
**For Payments Received Through:** 4/24/2026
**Includes Civil Settlements** **$ 12,286,480.55** (A)

| Ref No. | Defendant | Restitution Ordered | Restitution Payments: Total | Restitution Payments: Direct by Defendant | Restitution Payments: J&S Credits | Restitution Balance Owed |
|---|---|---|---|---|---|---|
| | | A | B = (C + D) | C | D | E = (A - B) |
| 1 | Alex Pugman | $ 16,200,000.00 | $ 13,361,422.90 | $ 4,008,950.35 | $ 9,352,472.55 | $ 2,838,577.10 |
| 2 | Patricia Mcgill | $ 230,713.38 | $ 223,312.48 | $ 5,475.00 | $ 217,837.48 | $ 7,400.90 |
| 3 | Eugenia Roytenberg | $ 405,184.00 | $ 359,704.12 | $ 18,150.00 | $ 341,554.12 | $ 45,479.88 |
| 4 | Diana Koltman | $ 405,184.00 | $ 362,384.72 | $ 23,000.00 | $ 339,384.72 | $ 42,799.28 |
| 5 | Lioudmila Novikov | $ 405,184.00 | $ 359,704.12 | $ 31,464.07 | $ 328,240.05 | $ 45,479.88 |
| 6 | Edward Hearn | $ 42,211.00 | $ 42,211.00 | $ 25,897.91 | $ 16,313.09 | $ - |
| 7 | Inga Slipchenko | $ 296,900.00 | $ 287,316.95 | $ 4,825.00 | $ 282,491.95 | $ 9,583.05 |
| 8 | Cecelia Wiley | $ 258,000.00 | $ 253,830.48 | $ 18,750.00 | $ 235,080.48 | $ 4,169.52 |
| 9 | Anna Yakhnis | $ 121,567.00 | $ 121,567.00 | $ 22,985.02 | $ 98,581.98 | $ - |
| 10 | Zoya Shusterman | $ 118,880.00 | $ 118,880.00 | $ 800.00 | $ 118,080.00 | $ - |
| 11 | Matthew Kolodesh | $ 16,200,000.00 | $ 13,361,422.90 | $ 9,125,981.63 | $ 4,235,441.27 | $ 2,838,577.10 |
| 12 | Angelica Bagdasarova | $ 156,213.00 | $ 156,213.00 | $ 23,287.42 | $ 132,925.58 | $ - |
| 13 | Svetlana Ganetsky | $ - | $ - | $ - | $ - | $ - |
| 14 | Natalya Shvets | $ 253,196.00 | $ 249,550.83 | $ 7,591.88 | $ 241,958.95 | $ 3,645.17 |
| 15 | Giorgi Oqroshidze | $ 189,907.00 | $ 189,907.00 | $ 32,089.62 | $ 157,817.38 | $ - |
| 16 | Yevgeniya Goltman | $ 195,583.00 | $ 195,583.00 | $ 6,200.00 | $ 189,383.00 | $ - |
| 17 | Alexander Koptyakov | $ 215,517.00 | $ 214,821.66 | $ 5,975.00 | $ 208,846.66 | $ 695.34 |
| | **Totals** | **$ 16,200,000.00** | **$ 13,361,422.90** | | | **$ 2,838,577.10** |

Notes:

(A) Kolodesh and Yakobashvili Civil settlement payments $ 8,812,253.36
Pugman and Ganetsky Civil settlement payments $ 3,474,227.19
Total Civil settlement payments $ 12,286,480.55
(Both settlement amounts exclude amounts returned to defendants for taxes/future taxes on restrained accounts).

(B) This report includes $237,500.00 received by the Department of Justice from Matthew Kolodesh.

GOVERNMENT EXHIBIT 4
PENGAD-Bayonne, N.J.

Prepared by the PAED Clerk's Office - 5/4/2026

**Step 1**
**Mapping of Joint & Several Relationships from the Judgments in a Criminal Case**

| | | | Joint & Several Relationships | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Restitution** | **Case No.** | **Defendant** | **Pugman** | **Ganetsky** | **Roytenberg** | **Koltman** | **Novikov** | **Hearn** | **Slipchenko** | **Wiley** | **Yakhnis** | **Kolodesh** | **Bagdasarova** | **Mcgill** | **Shvets** | **Oqroshidze** | **Goltman** | **Koptyakov** | **Shusterman** |
| $16,200,000 | DPAE209CR000651-1 | Pugman | 09-651 | 09-652 | 11-84 | 11-182 | 11-189 | 11-297 | 11-298 | 11-322 | 11-362 | 11-464 | 11-638 | 12-112-1 | 12-112-2 | 12-112-3 | 12-112-4 | 12-112-5 | 11-399 |
| $405,184 | DPAE209CR000652-1 | Ganetsky | 09-651 | 09-652 | 11-84 | 11-182 | 11-189 | | 11-298 | | | 11-464 | | 12-112-1 | | | | | 11-399 |
| $405,184 | DPAE211CR000084-1 | Roytenberg | 09-651 | 09-652 | 11-84 | 11-182 | 11-189 | | 11-298 | | | 11-464 | | | | | | | 11-399 |
| $405,184 | DPAE211CR000182-1 | Koltman | 09-651 | 09-652 | 11-84 | 11-182 | 11-189 | | 11-298 | | | 11-464 | | | 12-112-2 | | | | 11-399 |
| $405,184 | DPAE211CR000189-1 | Novikov | 09-651 | 09-652 | 11-84 | 11-182 | 11-189 | | 11-298 | | | 11-464 | | | | | | | 11-399 |
| $42,211 | DPAE211CR000297-1 | Hearn | 09-651 | | | | | 11-297 | 11-298 | 11-322 | 11-362 | 11-464 | | | 12-112-2 | 12-112-3 | 12-112-4 | 12-112-5 | 11-399 |
| $296,900 | DPAE211CR000298-1 | Slipchenko | 09-651 | 09-652 | 11-84 | 11-182 | 11-189 | 11-297 | 11-298 | 11-322 | 11-362 | 11-464 | 11-638 | 12-112-1 | 12-112-2 | 12-112-3 | 12-112-4 | 12-112-5 | 11-399 |
| $258,000 | DPAE211CR000322-1 | Wiley | 09-651 | | | | | 11-297 | 11-298 | 11-322 | 11-362 | 11-464 | 11-638 | | 12-112-2 | 12-112-3 | 12-112-5 | 12-112-5 | 11-399 |
| $121,567 | DPAE211CR000362-1 | Yakhnis | 09-651 | | | | | 11-297 | 11-298 | 11-322 | 11-362 | 11-464 | 11-638 | | 12-112-2 | 12-112-3 | 12-112-4 | 12-112-5 | 11-399 |
| $16,200,000 | DPAE211CR000464-1 | Kolodesh | 09-651 | 09-652 | 11-84 | 11-182 | 11-189 | 11-297 | 11-298 | 11-322 | 11-362 | 11-464 | 11-638 | 12-112-1 | 12-112-2 | 12-112-3 | 12-112-4 | 12-112-5 | 11-399 |
| $156,213 | DPAE211CR000638-1 | Bagdasarova | 09-651 | | | | | | 11-298 | 11-322 | 11-362 | 11-464 | 11-638 | | 12-112-2 | 12-112-3 | 12-112-4 | 12-112-5 | 11-399 |
| $230,713 | DPAE212CR000112-1 | Mcgill | 09-651 | 09-652 | | | | | 11-298 | | | 11-464 | | 12-112-1 | 12-112-2 | | | | 11-399 |
| $253,196 | DPAE212CR000112-2 | Shvets | 09-651 | | | 11-182 | | 11-297 | 11-298 | 11-322 | 11-362 | 11-464 | 11-638 | 12-112-1 | 12-112-2 | 12-112-3 | 12-112-4 | 12-112-5 | 11-399 |
| $189,907 | DPAE212CR000112-3 | Oqroshidze | 09-651 | | | | | 11-297 | 11-298 | 11-322 | 11-362 | 11-464 | 11-638 | 12-112-1 | 12-112-2 | 12-112-3 | 12-112-4 | 12-112-5 | 11-399 |
| $195,583 | DPAE212CR000112-4 | Goltman | 09-651 | | | | | 11-297 | 11-298 | 11-322 | 11-362 | 11-464 | 11-638 | 12-112-1 | 12-112-2 | 12-112-3 | 12-112-4 | 12-112-5 | 11-399 |
| $215,517 | DPAE212CR000112-5 | Koptyakov | 09-651 | | | | | 11-297 | 11-298 | 11-322 | 11-362 | 11-464 | 11-638 | 12-112-1 | 12-112-2 | 12-112-3 | 12-112-4 | 12-112-5 | 11-399 |
| $118,880 | DPAE211CR000399-1 | Shusterman | 09-651 | 09-652 | 11-84 | 11-182 | 11-189 | 11-297 | 11-298 | 11-322 | 11-362 | 11-464 | 11-638 | 12-112-1 | 12-112-2 | 12-112-3 | 12-112-4 | 12-112-5 | 11-399 |

PENGAD-Bayonne, N. J.
GOVERNMENT EXHIBIT
7

**Step 2**

**Mapping of the Financial Joint & Several ("J&S") Relationships**

X = Part of Bucket

| | | | 0.3% | 0.5% | 0.0% | 0.4% | 0.0% | 0.0% | 0.1% | 0.2% | 0.0% | 0.2% | 0.1% | 1.7% | 0.1% | 0.2% | 96.2% | 100.0% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | Restitution per J&S Account | | $ 42,211.00 | $ 76,669.00 | $ 2,687.00 | $ 68,340.00 | $ 5,676.00 | $ 2,841.00 | $ 17,093.00 | $ 37,679.00 | $ 4,804.00 | $ 25,256.38 | $ 13,643.62 | $ 277,192.38 | $ 12,422.62 | $ 25,256.38 | $15,588,228.62 | $ 16,200,000.00 |
| | | | Joint & Several Account Number: | | | | | | | | | | | | | | | |
| **Ref No.** | **Defendant** | **Restitution Ordered** | **DPAE211CR000464-A** | **DPAE211CR000464-B** | **DPAE211CR000464-C** | **DPAE211CR000464-D** | **DPAE211CR000464-E** | **DPAE211CR000464-F** | **DPAE211CR000464-G** | **DPAE211CR000464-H** | **DPAE211CR000464-I** | **DPAE211CR000464-J** | **DPAE211CR000464-K** | **DPAE211CR000464-L** | **DPAE211CR000464-M** | **DPAE211CR000464-N** | **DPAE211CR000464-O** | |
| 6 | Edward Hearn | $ 42,211.00 | X | | | | | | | | | | | | | | | |
| 10 | Zoya Shusterman | $ 118,880.00 | X | X | | | | | | | | | | | | | | |
| 9 | Anna Yakhnis | $ 121,567.00 | X | X | X | | | | | | | | | | | | | |
| 12 | Angelica Bagdasarova | $ 156,213.00 | | X | X | X | X | X | | | | | | | | | | |
| 15 | Giorgi Oqroshidze | $ 189,907.00 | X | X | X | X | | | | | | | | | | | | |
| 16 | Yevgeniya Goltman | $ 195,583.00 | X | X | X | X | X | | | | | | | | | | | |
| 17 | Alexander Koptyakov | $ 215,517.00 | X | X | X | X | X | X | X | | | | | | | | | |
| 2 | Patricia Mcgill | $ 230,713.38 | | X | | X | X | | X | X | | X | | | | | | |
| 14 | Natalya Shvets | $ 253,196.00 | X | X | X | X | X | X | X | X | | | | | | | | |
| 8 | Cecelia Wiley | $ 258,000.00 | X | X | X | X | X | X | X | X | X | | | | | | | |
| 7 | Inga Slipchenko | $ 296,900.00 | X | X | X | X | X | X | X | X | X | X | X | | | | | |
| 3 | Eugenia Roytenberg | $ 405,184.00 | | X | | | | | | | | | X | X | X | X | | |
| 4 | Diana Koltman | $ 405,184.00 | | X | | | | | | X | | | X | X | | | | |
| 5 | Lioudmila Novikov | $ 405,184.00 | | X | | | | | | | | | X | X | X | X | | |
| 1 | Alex Pugman | $ 16,200,000.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | |
| 11 | Matthew Kolodesh | $ 16,200,000.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | |
| 13 | Svetlana Ganetsky | | | | | | | | | | | | | | | | | |

GOVERNMENT EXHIBIT 8

PENGAD-Bayonne, N.J.

Prepared by the PAED Clerk's Office - 3/24/2026